# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **SPADA PROPERTIES, INC.,** an Oregon corporation dba **UNITED SALAD CO.**, | Case No. 3:13-cv-01760-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **UNIFIED GROCERS, INC.,** a California corporation, | |
| Defendant. | |

David P. Weiner and Sanford R. Landress, GREENE & MARKLEY, P.C., 1515 SW Fifth Avenue, Suite 600, Portland, OR 97201. Of Attorneys for Plaintiff.

Jeremy D. Sacks, Brandy A. Sargent, and Stephen H. Galloway, STOEL RIVES LLP, 900 SW Fifth Avenue, Suite 2600, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Spada Properties, Inc., doing business as United Salad Co. ("USC" or "Plaintiff"), brings this action against Unified Grocers, Inc. ("Unified" or "Defendant"), alleging claims regarding the bankruptcy of a "Food 4 Less" grocery store to which both USC and Unified supplied groceries. Plaintiff asserts four claims: (1) violation of the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499b, 499e; (2) conversion of trust funds; (3) money had and received; and

(4) breach of fiduciary duty.  Before the Court is Defendant's Motion for Summary Judgment on all claims. Dkt. 59. For the reasons that follow, Unified's motion is granted and this case is dismissed.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

The Perishable Agricultural Commodities Act ("PACA") comprehensively regulates the nation's produce industry. Congress enacted PACA in 1930 "in order to provide growers and sellers of agricultural commodities with 'a self-help tool . . . enabl[ing] them to protect themselves against the abnormal risk of losses resulting from slow-pay and no-pay practices by buyers or receivers of fruits and vegetables.'" *D.H. Rothman & Co. v. Korea Commercial Bank of New York*, 411 F.3d 90, 93 (2d Cir. 2005) (alterations in original) (citing *Regulations Under*

*the Perishable Agricultural Commodities Act; Addition of Provisions to Effect a Statutory Trust*,
Final Rule, 49 Fed. Reg. 45735, 45737 (USDA Nov. 20, 1984)). PACA requires purchasers of
perishable produce to provide full and prompt payment to produce sellers. 7 U.S.C. § 499b(4).
As described more fully below, § 499e(c)(2) of PACA creates a non-segregated, floating trust for
the benefit of a seller of perishable commodities. The trust comes into existence when produce is
delivered, and remains in effect until payment is received. *See Sunkist Growers, Inc. v. Fisher*,
104 F.3d 280, 281 (9th Cir. 1997). PACA trust rights are superior to the rights of secured
creditors, who can in certain circumstances be required to disgorge any PACA trust proceeds
received. *See Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1067
(2d Cir. 1995); *Consumer Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1381
(3d Cir. 1994).

USC is an Oregon corporation that sells and distributes fresh fruit and produce and is
licensed by the Secretary of Agriculture under PACA. For almost 20 years, USC was the primary
wholesale produce supplier for Food Ventures 87, Inc., doing business as "Food 4 Less"
("Food 4 Less"). The allegations in USC's Amended Complaint, however, deal only with
produce shipments made by USC to Food 4 Less between July 21, 2011 and April 24, 2012.

Unified is a secured seller of non-PACA qualified food and also supplies groceries to
Food 4 Less. In 2007, Food 4 Less became a member of Unified, which operates as a retailer-
owned grocery cooperative. As part of the initial purchase agreement between Food 4 Less and
Unified, Food 4 Less authorized Unified to withdraw automatic payments from Food 4 Less'
bank accounts. During the period at issue, Unified received payments from Food 4 Less totaling
$8,099,459.16. These payments to Unified were made through automatic withdrawals authorized
by Food 4 Less.

PAGE 3 – OPINION AND ORDER

Between July 21, 2011 and April 24, 2012, among other times, USC sold fresh fruit and produce to Food 4 Less on stated terms requiring payment within ten days after invoice. The invoice date was also the date of delivery. Each invoice sent by USC to Food 4 Less included the following statement:

> The perishable agricultural commodities listed on this statement are sold subject to the statutory trust authorized by Section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities and any receivables or proceeds from the sale of these commodities until full payment is received.

Spada Decl. ¶ 8, Dkt. 16.[1]

Although the formal stated terms included in USC's invoices to Food 4 Less required payment in full within ten days of delivery, in the course of practice, USC often allowed Food 4 Less to pay within 30 days of delivery from some period. In fact, at some point in time, Food 4 Less began to pay even later than 30 days after delivery. USC chose not to commence collection actions against Food 4 Less based on USC's long relationship with Food 4 Less and the reassurances made to USC by the owners of Food 4 Less. This practice continued for some time.

After Food 4 Less began to experience financial difficulties, it got further and further behind on payments owed to USC. By January of 2009, Food 4 Less was at least five months behind on its payments. Ernest Spada, the owner of USC, and Michael Leech, the owner of Food 4 Less, talked frequently about Food 4 Less' growing inability timely to pay USC. In July of 2009, USC asked for and received from Food 4 Less a promissory note in the amount of $500,000. USC used the payments received on the $500,000 promissory note to reduce a portion of Food 4 Less' past due account. The note required Food 4 Less to pay $22,000 a month to USC

---

[1] This statement is taken verbatim from 7 C.F.R. § 46.46(f)(3).

for two years. This covered both principal and interest due on the $500,000 note. The note was paid off by August 2011, at which time Food 4 Less was eight months behind on its produce payments to USC. Around this time, Mr. Leech offered USC a security agreement on his personal boathouse, worth approximately $180,000, which USC accepted. In April 2012, USC began selling produce to Food 4 Less only on a cash-on-delivery basis.

On or about April 30, 2013, Food 4 Less filed a voluntary petition under Chapter 7 of the Bankruptcy Code. The bankruptcy matter was closed as a "no asset" case without any distribution to creditors on or about August 21, 2013. USC alleges that as of January 28, 2013, Food 4 Less still owed USC the total principal amount of $830,711.13.

## DISCUSSION

Plaintiff filed an Amended Complaint (Dkt. 55) on September 23, 2014, asserting four claims: (1) violation of the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499b, 499e; (2) conversion of trust funds; (3) money had and received; and (4) breach of fiduciary duty. Defendant moves for summary judgment on all of Plaintiff's claims.

### A.  PACA Claims Under 7 U.S.C. §§ 499b and 499e

Plaintiff's first claim for relief asserts PACA trust rights in the proceeds of Food 4 Less' sales of PACA-qualified goods, and thus asserts its PACA claim against Defendant as a third-party transferee of PACA trust assets, or proceeds. Defendant moves for summary judgment on this claim on three alternative grounds: (1) Plaintiff's PACA claim is barred by the two-year statute of limitations; (2) Plaintiff's PACA claim is barred by the doctrine of laches; and (3) Plaintiff's course of dealing with Food 4 Less waived, or voided, Plaintiff's PACA trust rights. The Court first reviews the relevant portions of PACA applicable to this claim and then addresses each of Defendant's three arguments in turn.

### 1. The Perishable Agricultural Commodities Act

Congress enacted PACA in 1930 "to regulate the sale of perishable agricultural commodities." *Endico Potatoes*, *Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1066 (2d Cir. 1995). PACA was intended to encourage fair trading practices, suppress unfair and fraudulent business practices in the marketing of perishable commodities and provide remedies for breach of contractual obligations. *See id.* To this end, produce dealers violate PACA if they do not promptly pay in full for any perishable commodity purchased in interstate commerce. 7 U.S.C. § 499b(4); *see also Sunkist Growers, Inc.*, 104 F.3d at 282. Failure promptly to pay in full exposes the violating buyer to civil liability in favor of the seller.[2] 7 U.S.C. § 499e.

In the early 1980s, Congress reexamined PACA in the wake of a sharp increase in payment defaults by produce buyers. Although it found that PACA generally worked well in making the marketing of perishable agricultural commodities more orderly and efficient, Congress determined that sellers still needed greater protection. *See American Banana Co. v. Republic Nat. Bank of New York, N.A.*, 362 F.3d 33, 37 (2d Cir. 2004) (discussing history and purpose of PACA); *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 670 (7th Cir. 2002) (same). Congress noted that, as a result of the exigencies of the perishable commodities business, sellers were typically required to sell their produce quickly and often found themselves in the position of unsecured creditors of buyers whose creditworthiness could not be verified. If buyers defaulted, sellers could look only to the commodities (which would

---

[2] The elements of a PACA trust claim are: (1) plaintiff is a PACA licensee; (2) plaintiff sold perishable agricultural commodities; (3) the buyer was subject to the trust provisions of PACA; (4) the perishable agricultural commodities traveled through interstate commerce; (5) plaintiff preserved their PACA trust rights by providing requisite notice to the buyer; and (6) the buyer has not made full payment on at least some of the produce provided by plaintiff. *See* 7 C.F.R. § 46.46; *Belleza Fruit, Inc. v. Suffolk Banana Co.*, 2012 WL 2675066, at *8 (E.D.N.Y. July 5, 2012).

have perished) or to the sales proceeds of the commodities. Because sellers were typically

unsecured creditors, they generally stood in line behind banks and other lenders who had

obtained security interests in the defaulting purchaser's inventories, proceeds, and receivables.

As a result, produce sellers were often unable to collect all of the monies owed to them. *See*

*American Banana*, 362 F.3d at 37 (citing 7 U.S.C. § 499e(c)(1), 1984 U.S.C.C.A.N. 405, 406-07,

and *Endico Potatoes*, 67 F.3d at 1067).

In 1984, Congress amended PACA to add an additional protection for produce

suppliers—a non-segregated, floating trust that gives sellers a security interest in the produce and

its proceeds and makes the security interest superior to the claims of the buyer's other secured

creditors. *See* An Act to Amend the Perishable Agricultural Commodities Act, 1930, Pub. L. No.

98-273, 98 Stat. 165 (codified as amended 7 U.S.C. § 499e(c) (1984)); 7 C.F.R. § 46.46(b)

(2011). As the Ninth Circuit explained:

> The PACA provisions provide for the establishment of a
> nonsegregated trust under which a produce dealer holds its
> produce-related assets as a fiduciary until full payment is made to
> the produce seller. The trust automatically arises in favor of a
> produce seller upon delivery of produce and is for the benefit of all
> unpaid suppliers or sellers involved in the transaction until full
> payment of the sums owing has been received.

*In re Milton Poulos, Inc.*, 947 F.2d 1351, 1352 (9th Cir. 1991) (citations omitted). In return for

these "extraordinary protections," however, PACA establishes certain "strict eligibility

requirements." *Patterson* 307 F.3d at 669 (discussing PACA's history and statutory text).

One requirement involves notice given to buyers of PACA goods. In order to preserve its

PACA trust rights, a seller must comply with the notice provisions of 7 U.S.C. §§ 499e(c)(3) or

(4). Subsection (4) provides in relevant part:

> In addition to the method of preserving the benefits of the trust
> specified in paragraph (3), a licensee may use ordinary and usual
> billing or invoice statements to provide notice of the licensee's

> intent to preserve the trust. The bill or invoice statement must
> include the information required by the last sentence of paragraph
> (3) and contain on the face of the statement the following: "The
> perishable agricultural commodities listed on this invoice are sold
> subject to the statutory trust authorized by section 5(c) of the
> Perishable Agricultural Commodities Act, 1930 (7 U.S.C.
> 499e(c)). The seller of these commodities retains a trust claim over
> these commodities, all inventories of food or other products
> derived from these commodities, and any receivables or proceeds
> from the sale of these commodities until full payment is received."

7 U.S.C. § 499e(c)(4).[3]

Another requirement for PACA eligibility is that PACA applies only to those selling

produce on a short-term credit basis. *Patterson*, 307 F.3d at 669 (7th Cir. 2002); 7 C.F.R.

§ 46.46(e)(1) and (2). Thus, to preserve PACA trust rights, sellers are required to have a "prompt

payment" agreement with buyers. The relevant regulations are found in 7 C.F.R. § 46.46.

Specifically, paragraph (e)(1) of § 46.46, provides a ten-day statutory default for prompt

accounting and prompt payments and explains that parties that agree to other payment schedules

must reduce the agreement to writing. 7 C.F.R. § 46.46(e)(1) (defining "prompt payment" as ten

days after delivery in most instances). Paragraph (e)(2) of § 46.46 states that the maximum time

for payment after shipment that the seller and buyer can agree to "*prior to the transaction*, and

still be eligible for benefits under the trust is 30 days after receipt and acceptance of the

commodities." 7 C.F.R. § 46.46(e)(2) (emphasis added). This limitation to short-term credit

arrangements balances a seller's right to payment against a buyer's need to finance its

---

[3] A previous version of PACA also required that the seller provide notice to the Secretary of Agriculture in order to preserve trust rights. This requirement was eliminated in the 1995 amendments. *See* An Act to Amend the Perishable Agricultural Commodities Act, 1930, Pub. L. No. 104-48, §§ 6, 8(b), 109 Stat. 427, 429.

operations, thus serving the public interest by alleviating the "burden on commerce," 7 U.S.C.

§ 499e(c)(1), with which Congress was primarily concerned.[4]

Despite the strict time limitations for payment schedules, the regulations also provide that

a seller's acceptance of partial payments or agreement to payment schedules after a buyer's

default will not disqualify a seller from being able to exercise its PACA trust rights:

> If there is a default in payment as defined in § 46.46(a)(3), the
> seller, supplier, or agent who has met the eligibility requirements
> of paragraphs (e)(1) and (2) of this section will not forfeit
> eligibility under the trust by agreeing in any manner to a schedule
> for payment of the past due amount or by accepting a partial
> payment.

7 C.F.R. § 46.46(e)(3). Therefore, the regulations distinguish between pre-default payment

agreements and post-default arrangements.

This regulation is discussed in more detail below in relation to Defendant's argument that

Plaintiff waived its PACA rights. Before addressing that claim, however, the Court addresses

Defendant's statute of limitations and laches arguments. An explanation of why those two

arguments fail will help calrify how and why Defendant's waiver argument succeeds.

---

[4] Describing the purpose of PACA, 7 U.S.C. § 499e(c)(1) states:

> [A] burden on commerce in perishable agricultural commodities is
> caused by financing arrangements under which commission
> merchants, dealers, or brokers, who have not made payment for
> perishable agricultural commodities purchased, contracted to be
> purchased, or otherwise handled by them on behalf of another
> person, encumber or give lenders a security interest in, such
> commodities, or on inventories of food or other products derived
> from such commodities, and any receivables or proceeds from the
> sale of such commodities or products, and ... such arrangements
> are contrary to the public interest. This [Act] is intended to remedy
> such burden on commerce in perishable agricultural commodities
> and to protect the public interest.

### 2. **Statute of Limitations**

In an earlier opinion in this matter, denying Plaintiff's motion for summary judgment, the Court held that a two-year statute of limitations applies to Plaintiff's PACA claim. *Spada Properties, Inc. v. Unified Grocers, Inc.*, 38 F. Supp. 3d 1223 (D. Or. 2014), *as amended* (Sept. 22, 2014). The Court further held that:

> [T]he statute of limitations began to run when USC knew that Food 4 Less was violating PACA. USC moved for summary judgment on the statute of limitations affirmative defense based solely on the contention that the statute of limitations began to run from the date designated in this lawsuit, July 21, 2011. Because Unified did not cross move for summary judgment on this affirmative defense and because neither party has briefed the issue of when USC became aware that Food 4 Less was violating PACA, the Court does not reach whether there is a dispute of fact as to when the statute of limitations began to run, but rather denies summary judgment on this point as a matter of law.

*Id.* at 1237. Defendant now moves for summary judgment on its statute of limitations defense, contending that Plaintiff's PACA claim accrued more than a decade ago, when Plaintiff first became aware that Food 4 Less was breaching the PACA trust provisions.

Defendant's argument in support of its statute of limitations defense is based upon Plaintiff's long history of accepting or tolerating[5] late payments from Food 4 Less. Plaintiff concedes that as early as 1998, Food 4 Less was more than 10 days late, and often more than 30 days late, on its payments owed to Plaintiff. Over time, Food 4 Less fell further and further behind on its payments to Plaintiff. Defendant submitted the declaration of Jeremy D. Sacks

---

[5] Plaintiff argues that Defendant's reference to Plaintiff "accepting" late payments from Food 4 Less is a "gross distortion of the facts," and instead claims that Plaintiff "merely tolerated" late payment by Food 4 Less and "was forced to do so for practical business reasons." Specifically, Plaintiff contends that "[h]ad USC not continued to do business with Food 4 Less, any possibility of ever being paid in full would have been destroyed." This contention is discussed more fully below regarding Defendant's arguments regarding laches and Plaintiff's waiver of PACA rights.

(Dkt. 60), which includes an analysis of Plaintiff's "A/R Customer Inquiry and its Customer Ledger" dating back to late 1998.[6] This analysis shows that, since at least late 1998, Food 4 Less has never paid Plaintiff within 10 days after delivery. By January 6, 1999, Food 4 Less invoice payments were paid 6 weeks after the date of delivery and Food 4 Less was $94,860.25 behind on its payments to Plaintiff. With the exception of a brief period around 2001, the delay between delivery and payment by Food 4 Less steadily increased and the amount owed to Plaintiff grew larger. After February 23, 2004, Food 4 Less did not pay a single invoice within 30 days of delivery. By April 2012, when Plaintiff began selling produce to Food 4 Less on a cash-on-delivery basis only, Food 4 Less was paying Plaintiff at least 8 months late and owed Plaintiff more than one million dollars. By the time Food 4 Less' bankruptcy case was closed in August 2013, Food 4 Less owed Plaintiff $830,711.13.

Defendant also relies on the Court's earlier opinion in this case, stating that "the statute of limitations began to run when USC knew that Food 4 Less was violating PACA." *Spada*, 38 F. Supp. 3d at 1237. Based upon this conclusion and the payment data discussed above, Defendant reasons that, because Plaintiff was "aware" that Food 4 Less was violating PACA as early as 1998, Plaintiff's PACA claim is barred by the two-year statute of limitations. Plaintiff, however, responds that it only seeks to recover for specific invoices dated between July 21, 2011 and April 24, 2012, and that the statute of limitations should therefore begin to run no earlier than the date designated in Plaintiff's Amended Complaint, July 21, 2011, the date of the earliest invoice that Plaintiff contends is at issue.

---

[6] Plaintiff does not dispute the accuracy of Defendant's analysis of this data, but instead argues that it is unable to "verify Defendant's factual representations about remote historical facts." Plaintiff, however, states that it has reviewed data back to January 1, 2002 on Food 4 Less' "main account" and September 23, 2005 on Food 4 Less' "special account."

Consistent with the Court's earlier ruling in this case, the statute of limitations on Plaintiff's PACA claim began to run when Plaintiff, being unpaid, first becomes aware that Food 4 Less was violating PACA. The logical difficulty, however, with Defendant's position—that Plaintiff's PACA claim accrued as early as 1998—is that it would require the Court to find that the statute of limitations began to run long before Food 4 Less ever contracted with Plaintiff to deliver the majority of produce shipments between 1998 and 2013. This makes little sense. The text of PACA demonstrates that each shipment of goods made by a PACA beneficiary logically exists as a separate unit or transaction for purposes of PACA protection. *See* 7 C.F.R. § 46.46(e)(2) (declaring that "[t]he maximum time for payment *for a shipment* to which a seller, supplier, or agent can agree . . . and still be eligible for benefits under the [PACA] trust is 30 days after receipt and acceptance of the commodities") (emphasis added); 7 C.F.R. § 46.46(f)(1) (declaring that "notice of intent to preserve [trust] benefits" must include certain information "*for each shipment*") (emphasis added); *see also Hiller Cranberry Products, Inc. v. Koplovsky*, 165 F.3d 1, 12 (1st Cir. 1999) ("Congress and the Secretary of Agriculture have made reasonably clear their intention to treat each shipment of perishable goods as a unit for the purpose of determining that shipment's eligibility for PACA protection."). Moreover, as a matter of basic legal principle, the statute of limitations "requires a lawsuit to be filed within a specified period of time *after* a legal right has been violated." *McDonald v. Sun Oil Co.*, 548 F.3d 774, 779-80 (9th Cir. 2008) (emphasis added). Here, Plaintiff's PACA rights in a specific shipment of goods could not be violated before Plaintiff ever contracted with Food 4 Less to make that particular shipment to Plaintiff.

In addition to the plain meaning of the statutory text, this interpretation is logical. Consider the following: A hypothetical seller of PACA goods sells a shipment of green apples to

a buyer on 10-day payment terms and a shipment of red apples on 90-day terms. The seller would maintain PACA rights over the shipment of green apples, but not the red apples, assuming that the seller met all other PACA requirements. The shipment of green apples complies with 7 C.F.R. § 46.46(e)(1)'s default ten-day terms; the shipment of red apples, however, violates 7 C.F.R. § 46.46(e)(2)'s 30-day statutory maximum time for payment to which a buyer and seller may agree and still be eligible for PACA benefits. PACA does not prohibit sellers from selling some goods under PACA's terms and other goods outside of them. Each shipment logically stands as a separate unit or transaction for the purpose of determining whether that shipment qualifies for PACA protection. Accordingly, the statute of limitations as to a particular shipment of goods from Plaintiff (sold on 10-day terms) could not have run out before Food 4 Less ever agreed to purchase that shipment from Plaintiff.

This distinction is important given the factual circumstances of this case. Specifically, Defendant objects to the Court's previously-expressed reasoning on the grounds that between July 21, 2012 and April 24, 2012 (the end dates of Plaintiff's claims), Plaintiff received $882,606.99 from Food 4 Less, which is an amount greater than the combined total for all invoices at issue in this action. Plaintiff, however, applied these payments to older invoices that were dated months before July 21, 2012. In the Court's view, this fact is relevant to Defendant's argument that Plaintiff's agreements with Food 4 Less waived Plaintiff's PACA rights (as discussed below). It is not, however, relevant to the statute of limitations analysis because it goes only to the merits of Plaintiff's claim, not the date by which Plaintiff was required to file its claim. *See generally Underwood Cotton Co., Inc. v. Hyundai*, 288 F.3d 405, 408-09 (9th Cir. 2002) (statutes of limitation "preclude a plaintiff from proceeding . . . the right (moral or legal) goes on, but the plaintiff simply cannot go to court in order to enforce it") (citation omitted).

Thus, as to each shipment invoice for which Plaintiff seeks restitution from Defendant, the statute of limitations began to run the moment Plaintiff knew Food 4 Less had violated the terms of PACA with respect to that shipment. Because it is undisputed that the formal terms of Plaintiff's contracts with Food 4 Less included ten-day terms, the statutory default under 7 C.F.R. § 46.46(e)(1), Plaintiff's claims accrued ten days after the date of delivery of each shipment of produce. Because the earliest invoice for which Plaintiff seeks restitution was dated July 21, 2011, and the parties entered a tolling agreement commencing July 1, 2013, Plaintiff's claims are not barred by the two-year statute of limitations.

### 3.  Laches

The Court previously denied Plaintiff's motion for summary judgment against Defendant's laches defense. *See Spada*, 38 F. Supp. 3d at 1237. As the Court explained,

> For the same reasons discussed regarding the statute of limitations defense, Unified has demonstrated an issue of fact as to the first two elements of the laches defense. Unified has also demonstrated an issue of fact as to the third element of prejudice. If Unified were to have known that Food 4 Less was breaching its fiduciary duty to USC as a trustee, Unified could have made the decision to stop selling groceries to Food 4 Less years ago. Therefore, there is an issue of fact as to all three elements of the laches defense, and USC's motion for summary judgment is denied on this affirmative defense.

*Id.* Defendant now moves for summary judgment on this defense. To prevail on a laches defense, a defendant must prove:

> (1) plaintiff[] delayed asserting [its] claim for an unreasonable length of time, (2) with full knowledge of all relevant facts (and laches does not start to run until such knowledge is shown to exist), (3) resulting in such substantial prejudice to defendant[] that it would be inequitable for the court to grant relief.

*Mattson v. Commercial Credit Bus. Loans, Inc.*, 301 Or. 407, 419 (1986).[7]

Here, Defendant's laches defense fails for the same reasons that its statute of limitations defense fails. As explained above, each shipment of PACA goods stands as a separate transaction for the purpose of determining that shipment's eligibility for PACA protection. Accordingly, only shipments made by Plaintiff to Food 4 Less between July 21, 2011 and April 24, 2012 are at issue here. As to those specific shipments, Defendant fails to demonstrate either unreasonable delay or undue prejudice as a result of Plaintiff's present claims for these allegedly unpaid shipments of PACA goods.

Indeed, Defendant's statute of limitations and laches defenses both rest upon alleged prejudice resulting from Plaintiff's longstanding practice of routinely accepting late payments from Food 4 Less and then applying all payments to the oldest then-outstanding invoices. As explained above, Defendant claims it was prejudiced by this behavior because, between July 21, 2012 and April 24, 2012 (the end dates of Plaintiff's claims in this case), Plaintiff received $882,606.99 from Food 4 Less, an amount greater than the combined total for all invoices at issue in this action, and Plaintiff chose to apply this entire amount to older invoices dated months before July 21, 2012. These facts, however, go to the underlying merits of Plaintiff's claim— namely, whether Plaintiff's actions waived or voided Plaintiff's PACA rights; they do not establish unreasonable delay in bringing the claim itself. Accordingly, Defendant's motion for summary judgment on its laches defense is denied.

---

[7] Courts often reduce these three elements of laches to only two elements, "unreasonable delay" and "prejudice," presumably because a plaintiff's delay cannot fairly be considered "unreasonable" if the plaintiff lacked knowledge of all relevant facts. *See generally Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002) ("As the party asserting laches, [defendant] must show that (1) [plaintiff's] delay in filing suit was unreasonable, and (2) [defendant] would suffer prejudice caused by the delay if the suit were to continue."); *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000) ("To establish laches a defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.").

### 4. Plaintiff's Waiver of PACA Rights

Defendant also moves for summary judgment on Plaintiff's PACA claim on the grounds that Plaintiff's agreements with Food 4 Less waived Plaintiff's PACA trust rights. Plaintiff contends that no such waiver has occurred because the formal stated terms of Plaintiff's contracts with Food 4 Less never varied from PACA-compliant 10-day payment terms.

### a. Regulations Governing Pre-Default and Post-Default Agreements

Central to the Court's inquiry is the proper interpretation of 7 C.F.R. §§ 46.46(e)(1), (2), and (3), which are a portion of the Secretary of Agriculture's regulations implementing PACA. As discussed above, paragraph (e)(1) of § 46.46 provides for a ten-day statutory default for prompt accounting and prompt payment and explains that parties that agree to other payment schedules must reduce their agreements to writing. 7 C.F.R. § 46.46(e)(1) (defining prompt payment as within ten days after delivery, in most instances). Paragraph (e)(2) of § 46.46 states that the maximum time for payment after shipment to which the seller and buyer may agree "*prior to the transaction*, and still be eligible for benefits under the trust is 30 days after receipt and acceptance of the commodities." 7 C.F.R. § 46.46(e)(2) (emphasis added). Accordingly, parties who agree *in advance* to payment terms later than 30 days after delivery are not entitled to PACA trust protections.

Despite these strict time limitations for payment schedules, the regulations also provide that a seller's acceptance of partial payments or agreement to payment schedules *after* a buyer's default will not disqualify a seller from being able to exercise its PACA trust rights:

> If there is a default in payment as defined in § 46.46(a)(3), the seller, supplier, or agent who has met the eligibility requirements of paragraphs (e)(1) and (2) of this section will not forfeit eligibility under the trust by agreeing in any manner to a schedule for payment of the past due amount or by accepting a partial payment.

7 C.F.R. § 46.46(e)(3). Therefore, the regulations expressly distinguish between pre-default agreements and post-default agreements.

The precise legal effect of post-default agreements on a seller's PACA trust rights has long been a disputed issue. *See, e.g.*, *American Banana Co., v. Republic National Bank of New York, N.A.*, 362 F.3d 33, 38 (2d Cir. 2004); *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 671 (7th Cir. 2002); *Hiller Cranberry Products, Inc. v. Koplovsky*, 165 F.3d 1 (1st Cir. 1999); *Greg Orchards & Produce, Inc. v. P. Roncone J.*, 180 F.3d 888, 892 (7th Cir. 1999); *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 205 (3d Cir. 1998); *In re Lombardo Fruit and Produce Co.*, 12 F.3d 806, 809 (8th Cir. 1993); *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 781-82 (8th Cir. 1991). The Department of Agriculture, however, clarified this issue by amending 7 CFR § 46.46 in 2011. These amendments were accompanied by a Department of Agriculture notice of rulemaking, titled "Perishable Agricultural Commodities Act: Impact of Post-Default Agreements on Trust Protection Eligibility." 76 F.R. 20217-01.[8] In its 2011 rulemaking, the Department of Agriculture stated:

> (USDA) is amending the regulations under the Perishable Agricultural Commodities Act (PACA) to allow, if there is a default in payment as defined in the regulations, a seller, supplier, or agent who has met the PACA trust eligibility requirements to enter into a scheduled agreement for payment of the past due amount without foregoing its trust eligibility. USDA is also amending 7 CFR 46.46(e)(2) by adding the words "prior to the

---

[8] The Court applies *Auer* deference to an agency's interpretation of its own ambiguous regulations. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Peterson v. ConAgra Foods Inc.*, 2014 WL 3741853, at *3 (S.D. Cal. July 29, 2014) ("[W]here an agency interprets its own regulation, . . . its interpretation of an ambiguous regulation is controlling under *Auer* unless plainly erroneous or inconsistent with the regulation." (citations and quotation marks omitted)); *see also Hillsborough Cnty. v. Automated Med. Labs.*, 471 U.S. 707, 718 (1985) (noting that the preamble to a rulemaking is a way that "agencies normally address problems in a detailed manner"). Because the USDA's interpretation of its PACA regulations is not plainly erroneous or inconsistent, it is controlling. *But see Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1339 (2013) (Scalia, J., concurring in part dissenting in part) (urging rejection of the *Auer* doctrine).

> transaction." This change clarifies that the 30-day maximum time period for payment to which a seller can agree and still qualify for coverage under the trust refers to pre-transaction agreements.

*Id.* at 20217.

Further, citing *American Banana*, *Patterson Foods*, and other cases, the USDA explained that in recent years "several federal courts have invalidated the trust rights of unpaid creditors because these creditors agreed . . . after default on payment, to accept payments over time from financially troubled buyers," based on interpretations of 7 C.F.R. § 46.46(e)(2). *Id.* USDA disagreed with these judicial interpretations of the statute and regulations, stating, "[i]t is our interpretation that § 46.46(e)(2), like paragraph (e)(1) of the regulations . . . addresses pre-transaction agreements only." *Id.* (citations omitted). In explaining the amendment, the USDA emphasized the broad trust rights that PACA provides:

> In the context of the PACA trust, the right to make a claim against the trust are vested in the seller, supplier, or agent who has met the eligibility requirements of paragraph (e)(1) and (2) of § 46.46. The seller, supplier, or agent remains a beneficiary of the PACA trust until the debt owed is paid in full as stated in section 5(c)(4) of the statute. An agreement to pay the antecedent debt in installments is not considered payment in full. Thus, we do not believe that a post-default payment agreement should constitute a waiver of a seller's previously perfected trust rights.

*Id.* at 20217-18.

### b.  Application to Plaintiff's Contracts With Food 4 Less

Based upon disparate interpretations of the above regulatory structure, Plaintiff and Defendant disagree over whether Plaintiff's agreements with Food 4 Less resulted in a waiver of Plaintiff's PACA trust rights. Defendant argues that, despite Plaintiff's argument that the formal terms between Plaintiff and Food 4 Less stated that payment was due within ten days of delivery, Plaintiff's longstanding practice of accepting late payments constitutes a continuing series of *pre-default* agreements in violation of 7 C.F.R. § 46.46(e)(2). Plaintiff responds that, consistent

with the 2011 amendments to 7 C.F.R. § 46.46, because the written agreements between Plaintiff and Food 4 Less expressly stated that payment was due within ten days of delivery, any post-default acceptance of late payments "in any manner" does not waive Plaintiff's PACA trust protections. The factual underpinnings of each party's argument are not disputed. The relevant question is whether Plaintiff and Food 4 Less "agreed," *pre-default*, through their course of dealing or otherwise, that payments could be made after the 30-day statutory maximum under 7 C.F.R. § 46.46(e).

A district court in the Southern District of New York provided reasoning that is consistent with Defendant's interpretation of the PACA regulations here. In *A&J Produce Corp. v. City Produce Operating Corp.*, the district court denied the plaintiff's motion for summary judgment on its PACA claim, holding that the parties' course of dealings created a question of fact as to whether the plaintiff had "agreed" to payment terms in violation of PACA. The court noted that if the factfinder concluded that there was a course of dealing or oral agreement "between the parties by which plaintiff agreed to accept payment more than 30 days after receipt of the produce," then that agreement "would appear to remove plaintiff from the protections afforded by a PACA trust." 2011 WL 6780614, at *5 (S.D.N.Y. Dec. 23, 2011). The court interpreted the 2011 amendments to 7 C.F.R. § 46.46(e) as merely clarifying that PACA trust protection may be lost by *pre*-transaction agreements to extend payment beyond 30 days, but not by scheduled post-default accommodations. *Id.* at 4. The Court finds this reasoning persuasive. A course of dealing between Plaintiff and Food 4 Less reflecting an implicit agreement to accept payment more than 30 days after receipt of produce waives Plaintiff's PACA protections because it would result in a *pre*-default "agreement" to longer payment terms that are in violation of 7 C.F.R. § 46.46(e).

Plaintiff, however, objects to any reference to *A&J Produce*, arguing that this case was "expressly based" on *American Banana*, a 2004 Second Circuit opinion that, as discussed above, the USDA declined to follow in its 2011 amendments to 7 C.F.R. § 46.46(e). Thus, according to Plaintiff, *American Banana* and any case premised upon its reasoning represents "an outlier, a contagion of error" spreading through PACA jurisprudence. The Court disagrees. *A&J Produce* expressly grounded its holding in an analysis of the statutory text of PACA and the USDA's 2011 amendments to 7 C.F.R. § 46.46(e). In fact, the court in *A&J Produce* carefully discussed the *American Banana* opinion in order to explain the effect of the 2011 amendments. Moreover, contrary to Plaintiff's suggestion, a careful reading of *American Banana* contributes much to a proper understanding of PACA.

In *American Banana*, the court, after discussing the history, text, and purpose of PACA, found that there was no meaningful difference between pre-default and post-default agreements for PACA purposes. 362 F.3d at 44. In reaching this conclusion, the court found that "Congress made its intention to protect short-term payment arrangements clear by expressly refusing to bestow trust protection upon any credit transaction that extends beyond a reasonable period." *Id.* (citation omitted). As the court explained:

> We recognize that a post-default agreement is often the product of a reasonable effort by a seller to recover at least some of the debt owed to it without incurring the risks and costs of litigating under PACA, and that such an agreement therefore can be a useful tool for the recovery of unpaid debts. However, the result of a post-default agreement extending the payment period beyond thirty days is no different than that of a pre-transaction agreement doing the same: both are inconsistent with the prompt-payment objective, which is fundamental to PACA. *Whether the agreement is reached before the transaction or after a buyer has defaulted, it constitutes a credit arrangement permitting a buyer to make payments that are not considered prompt by Congress and the USDA.*

*Id.* (emphasis added). The court further emphasized that allowing post-default agreements would permit financially unsound produce buyers to remain in business, increasing systemic risk in the produce industry by exposing other unsuspecting persons to risk of nonpayment. *Id.* at 44-45 (citation omitted). Thus, the court found, consistent with its understanding of congressional intent, that a PACA seller waived its PACA rights if it agreed to a post-default payment plan with a buyer.

The Department of Agriculture, disagreeing with *American Banana* and other circuit courts opinions addressing this point, clarified this issue by amending 7 CFR § 46.46 in 2011. These specific amendments, and the USDA's explanation for them, have been discussed in detail above. Critical to understanding the correct interpretation of 7 CFR § 46.46 is USDA's reasoning for those amendments. USDA explained that, "[i]t is our interpretation that § 46.46(e)(2), like paragraph (e)(1) of the regulations . . . addresses pre-transaction agreements only." 76 F.R. 20217-01 (citation omitted). In explaining the amendments, the USDA emphasized the broad trust rights that PACA provides:

> In the context of the PACA trust, the right to make a claim against the trust are vested in the seller, supplier, or agent *who has met the eligibility requirements* of paragraph (e)(1) and (e)(2) of § 46.46. The seller, supplier, or agent remains a beneficiary of the PACA trust *until the debt owed is paid in full* as stated in section 5(c)(4) of the statute. An agreement to pay the antecedent debt in installments is not considered payment in full. Thus, we do not believe that a post-default payment agreement should constitute a waiver of a seller's *previously perfected trust rights*.

*Id.* at 20217-18 (emphasis added). Thus, USDA disagreed with the holding in *American Banana* that *any* post-default payment agreement waived PACA trust rights, because the PACA seller had not been "paid in full" within the meaning of the statute. As the emphasized text above indicates, however, the 2011 amendments limited post-default PACA protection to those PACA sellers with previously protected trust rights who had met the eligibility requirements under

§ 46.46. This is exactly what the Court in *A&J Produce* correctly understood: USDA's 2011 amendments to PACA applied only to post-default agreements; PACA sellers may still lose PACA trust rights through pre-default agreements that do not meet § 46.46's requirements.

In effect, Plaintiff's argument in this case amounts to a claim that, as long as PACA buyers and sellers include PACA-compliant language in their invoices, any *de facto* agreements to other than short-term credit arrangements based on a longstanding course of conduct, are still protected by PACA. This is not so, and in fact violates the core purposes of PACA. The relevant distinction and the one that makes all the difference in this case, involves what PACA sellers do *after* they agree to a post-default agreement with a buyer. By entering into a post-default agreement with a buyer, a PACA seller maintains any previously perfected trust rights in that particular shipment. This is because each shipment of PACA good stands as a separate unit or transaction for the purposes of PACA protection. If a PACA seller, like Plaintiff, however, agrees with a buyer to only apply future payments to the oldest then-outstanding invoice, the PACA seller has virtually guaranteed that the buyer cannot meet PACA compliant net-10 or net-30 payment terms as to subsequent shipments. The formal stated invoice terms for subsequent shipments then would directly contradict the parties' other agreement to apply future payments to old invoices. The parties have thus effectively turned a series of shipments, which should function as separate individual transactions for PACA purposes, into a revolving line of credit. Such arrangements, however, amount to pre-default agreements to extend payment terms beyond PACA-compliant terms in violation of 7 C.F.R. § 46.46(e)(2). This is contrary to the express text and congressional intent of PACA, as articulated in *American Banana* and other cases, because "it constitutes a credit arrangement permitting a buyer to make payments that are not considered prompt by Congress and the USDA." *American Banana*, 362 F.3d at 44.

Thus, with the proper interpretation of 7 C.F.R. § 46.46 clarified, the final relevant question is whether, drawing all inferences in favor of Plaintiff, there is any genuine dispute of material fact that the Plaintiff and Food 4 Less agreed to pre-default payment terms that are in violation of PACA eligibility requirements. Based upon all the evidence in the record, viewed in the light most favorable to Plaintiff as the non-moving party, there is no genuine dispute of material fact that Plaintiff and Food 4 Less agreed to allow payments to be made outside the requirements of PACA. The record before the Court shows that Food 4 Less made no payments within ten days for at least 13 years and made no payments within 30 days for eight years. During this time, the amounts owed by Food 4 Less on overdue invoices continued to grow ever larger, at one point reaching almost nine months overdue.

Further, Plaintiff concedes that it agreed with Food 4 Less to apply all payments to the oldest outstanding invoices. Thus, every time Plaintiff entered into a new transaction with Food 4 Less, it knew exactly how much money it was still owed, and as a result, was fully aware that Food 4 Less would be unable to pay within the PACA compliant terms, notwithstanding what was stated on the invoice. Plaintiff's agreement with Food 4 Less to apply all payments to old invoices, despite the ever-growing debt owed by Food 4 Less, made strict compliance with PACA highly unlikely, and, as a practical matter, impossible for the foreseeable future. This arrangement amounts to a *de facto* pre-default agreement to extend payment terms outside of PACA requirements in violation of 7 C.F.R. § 46.46(e)(2). This is contrary to the clear text and congressional intent that PACA protect only short-term credit arrangements. *American Banana*, 362 F.3d at 44; *Patterson*, 307 F.3d at 669.

Plaintiff objects to this conclusion on multiple grounds, arguing that: (1) Oregon law required Plaintiff to apply payments to the oldest outstanding invoices; (2) Plaintiff and Food 4

Less genuinely believed that Food 4 Less would eventually bring its accounts current and then move forward strictly within PACA-compliant terms; and (3) Plaintiff had no choice but to forego filing a PACA claim and continue selling goods to Food 4 Less lest its customer go bankrupt, foreclosing any possibility of Plaintiff ever being paid in full. Plaintiff contends that these points disprove that there was any agreement to accept payments outside of PACA terms.

Plaintiff's first argument is not only irrelevant, it is also wrong as a matter of Oregon law. Plaintiff first concedes that it agreed, at Food 4 Less' request, to apply all payments to the oldest of the outstanding invoices. As the Court explained above, this agreement resulted in the loss of Plaintiff's PACA rights as to future shipments of PACA goods because it made it essentially impossible for Food 4 Less to comply with PACA-compliant short-term payment terms, at least for the foreseeable future. This ends the relevant analysis. Despite this, Plaintiff argues that it should somehow be excused from these PACA requirements because Oregon law required it to apply payments to outstanding invoices in this way. The Court, however, can find no such Oregon law, and Defendant presents none, [9] that would prohibit the parties from arranging their business dealings in strict compliance with PACA eligibility requirements.

---

[9] Plaintiff cites *Fowler v. Courtemanche*, 202 Or. 413 (1954), and *Matter of Marriage of Gayer*, 326 Or. 436 (1998), for this proposition. Neither case supports Plaintiff's argument here. In fact, citing *Fowler*, the court in *Gayer* held:

> [T]hat, *in the absence of a statute or an agreement by the parties to the contrary*, the common law rule regarding the application of payments made by a debtor to a creditor is as follows: "(1) A debtor who makes payment to his creditor having two or more claims may designate the claim to which the payment is to be applied; (2) if the debtor fails to do so, the creditor may make the application: and (3) if neither of them makes the application, then it is the duty of the court to make it." If the court can determine with reasonable certainty the intention of the parties, either express or implied, the court shall apply payment accordingly. Generally, when neither the debtor nor the creditor directs application of the

As to Plaintiff's second argument, that the parties genuinely believed that Food 4 Less would eventually bring its accounts current and then move forward in accordance with PACA-compliant terms, Plaintiff has provided the declaration of Michael Leech, the owner of Food 4 Less. Mr. Leech states:

> [W]hen Food 4 Less could not pay on time, USC chose to keep trading with Food 4 Less and to forebear from filing a lawsuit in response to my requests. I honestly believed, as I repeatedly told USC, that Food 4 Less would be able to overcome its difficulties, bring its overdue bills current, and *then* move forward within the ten-day terms.

Leech Supp. Decl. ¶ 3, Dkt. 60 (emphasis added). Mr. Leech's statement, however, explicitly acknowledges that Food 4 Less would be unable to comply with PACA until it brought its overdue bills current. Moreover, the undisputed record shows that Mr. Leech and Food 4 Less did not pay Plaintiff on time for at least eight years. Mr. Leech's own declaration, combined with the undisputed payment history, is undisputed evidence that both Plaintiff and Food 4 Less knew in advance of each transaction at issue this lawsuit that Food 4 Less would not comply with PACA's prompt payment requirements, at least until its overdue invoices were first paid in full, which never occurred. This is exactly the sort of revolving line of credit arrangement that is prohibited by PACA's strict "prompt payment" eligibility requirements.

Finally, Plaintiff's third contention—that it had no practical choice but to continue doing business with Food 4 Less lest Food 4 Less go bankrupt—ignores the relevant legal analysis at this stage. Each separate shipment of produce by a PACA beneficiary exists as a separate

---

> payment and the court cannot infer the intention of the parties, payment is applied to the earliest matured debt.

*Id.* at 443 (citing *Fowler*, 202 Or. at 426) (emphasis added). The emphasized language makes all the difference: the parties may agree, absent a specific statute directing otherwise, to apply future payments to outstanding debts as they wish.

transaction for the purposes of PACA protection. If Plaintiff wished to arrange alternate payments terms to assist Food 4 Less overcome its financial difficulties, it could have continued doing business on non-PACA terms, such as cash-on-delivery, until Food 4 Less would be able to continue on PACA-compliant 10-day terms. Instead, Plaintiff agreed to apply all new payments for Food 4 Less to long overdue invoices, while simultaneously claiming that each subsequent transaction would be made under PACA-compliant terms. As Defendant notes, between July 21, 2012 and April 24, 2012, Plaintiff received $882,606.99 from Food 4 Less, an amount greater than the combined total for all invoices at issue in this action, but Plaintiff applied this entire amount to older invoices dated months before July 21, 2012. The effect of this practice is to circumvent the strict prompt payment requirements of PACA.

The large debt still owed Plaintiff at the time of Food 4 Less' bankruptcy is the consequence of Plaintiff's own repeated agreements to extend credit to Food 4 Less outside of PACA's express eligibility requirements. The Court does not question the sincerity of Plaintiff's belief, as articulated by Mr. Leech in his declaration, that Food 4 Less might, or even would, eventually, someday bring its accounts current and then move forward with PACA-compliant terms. This was a business decision that Plaintiff was free to make. Plaintiff, however, cannot agree to payment terms outside of PACA's strict eligibility requirements for its own business reasons and simultaneously avail itself of PACA's extraordinary protections. Such agreements are contrary to USDA's regulations and the congressional directive that PACA protect only short-term credit arrangements between buyers and sellers of PACA goods.

There is no genuine dispute of material fact that Plaintiff's agreements with Food 4 Less violated 7 C.F.R. § 46.46. Accordingly, Defendant is entitled to summary judgment on Plaintiff's PACA claim.

PAGE 26 – OPINION AND ORDER

**B.  Conversion of Trust Funds and Money Had and Received**

In addition to its PACA claim brought under 7 U.S.C. §§ 499b and 499e, Plaintiff also asserts common law claims for conversion of trust funds and money had and received. The parties agree, however, that both claims are dependent upon the existence of Plaintiff's PACA-created trust rights.[10] As discussed above, because the Court finds that Plaintiff's agreements with Food 4 Less resulted in Plaintiff waiving its PACA trust rights as to all shipments made between July 21, 2011 and April 24, 2012, Plaintiff cannot maintain common law claims that are dependent upon the existence of PACA-created rights in those shipments. Thus, Defendant is entitled to summary judgment on these claims.

**C.  Breach of Fiduciary Duty**

Under Oregon law, to recover for breach of fiduciary duty, the plaintiff must prove: (1) the existence of a fiduciary relationship between the parties; (2) a breach of one or more of the fiduciary duties arising out of that relationship; and (3) damage to the plaintiff resulting from a breach of one or more of those duties. *Evergreen West Bus. Ctr., LLC v. Emmert*, 254 Or. App. 361, 367 (2012).

Plaintiff's fourth claim for relief alleges that a fiduciary relationship existed between Defendant and either Food 4 Less or Plaintiff and that Defendant breached its fiduciary duties by failing to "fairly allocate the limited funds available to Food 4 Less between itself and Plaintiff." According to Plaintiff, the combination of Defendant's status as the supplier of the vast majority of Food 4 Less' non-PACA groceries and Defendant's contractual right to access Food 4 Less' bank account by automatic debit "created a relationship of control and dependency between [Defendant] and Food 4 Less such that Defendant should be held accountable as a fiduciary to

---

[10] Plaintiff's fourth claim, alleging breach of fiduciary duty, does not similarly depend upon PACA trust rights. This claim is addressed separately below.

both Food 4 Less and Plaintiff." Defendant responds that Plaintiff's fiduciary duty claim fails as

a matter of law because no fiduciary or other special relationship existed between Defendant and

either Food 4 Less or Plaintiff that would have conferred upon Defendant any duty to monitor

Food 4 Less' payment of its creditors. According to Defendant, the relationship between

Defendant and Food 4 Less was strictly arm's-length as seller and buyer and there was no

relationship between Defendant and Plaintiff.

   Under Oregon law, a fiduciary duty exists only where the parties are in a "special

relationship" in which one party is obliged to pursue the other party's best interests. *Conway v.*

*Pacific University*, 324 Or. 231, 237 (1996). In determining whether such a relationship exists:

> The focus [of the Court's inquiry] is not on the subject matter of
> the relationship, such as one party's financial future; nor is it on
> whether one party, in fact, relinquished control to the other. The
> focus instead is on whether the *nature of the parties' relationship*
> *itself* allowed one party to exercise control in the first party's best
> interests. In other words, the law does not imply a tort duty simply
> because one party to a business relationship begins to dominate
> and to control the other party's financial future. Rather, the law
> implies a tort duty only when that relationship is of the type that,
> by its nature, allows one party to exercise judgment on the other
> party's behalf.

*Bennett v. Farmers Ins. Co.*, 332 Or. 138, 161-162 (emphasis in original) (citing *Conway*, 324

Or. at 241).

   The Oregon Supreme Court's opinions in both *Conway* and *Bennett* establish that a

special relationship giving rise to a fiduciary duty exists only "when one party is acting, at least

in part, to further the economic interests of the other party." *Conway*, 324 Or. at 236 (citing

*Onita Pacific Corp. v. Trustees of Bronson*, 315 Or. 149, 161 (1992)). Such relationships include

"certain professional relationships in which one party has a professional obligation to protect the

interests of the other party," or contractual relationships of a kind that give rise to a "status upon

which the general law predicates a duty independent of the terms of the contract." *Conway*, 324

PAGE 28 – OPINION AND ORDER

at 237, 239. The court in *Conway* emphasized that where both parties act "in their *own* behalf, each for their own benefit," no special relationship exists. *Id.* at 242 (emphasis in original). Similarly, the court in *Bennett* reasoned that, where the parties' contract does not suggest that the alleged principal would "relinquish control over [its] business" or that the alleged fiduciary would "exercise independent judgment" over the principal's concerns, the nature of the relationship created is "not one in which [the fiduciary] was to step into [the principal's] shoes and to manage [its] business affairs," and consequently, the parties are not in a fiduciary relationship. *Bennett*, 332 Or. at 162-63; *see also A.T. Kearney, Inc. v. Int'l Bus. Machines Corp.*, 73 F.3d 238, 244 (9th Cir. 1995) ("The common thread in the special relationships that the [Oregon] Supreme Court has recognized as giving rise to a duty of care to protect against purely economic loss is that the professional is acting, at least in part, to further the economic interests of the person to whom the duty is owed.").

Plaintiff, however, urges the Court to ignore the Oregon Supreme Court's decisions in *Bennett* and *Conway*, arguing that neither decision is on point because those cases did not involve "commercial debtor/creditor" relationships. Instead, Plaintiff directs the Court to *Hampton Tree Farms, Inc. v. Jewett*, 125 Or. App. 178 (1993), a decision by the Oregon Court of Appeals that pre-dates both *Conway* and *Bennett*. Plaintiff contends that the Court of Appeals' decision in *Hampton Tree Farms* supports the proposition that "when a creditor exercises too much control over its debtor, that overly zealous creditor subjects itself to the same fiduciary duties imposed on the debtor's own officers and directors."

Plaintiff's argument rests entirely on the following paragraph from the Oregon Court of Appeals' opinion in *Hampton Tree Farms*:

> In the light of the parties' business and debtor-creditor relationship, the question is whether plaintiff's role could ever have become that

> of a fiduciary. In *Georgetown Realty v. The Home Ins. Co.*, 313 Or.
> 97, 111 (1992), the Supreme Court held that circumstances
> between contracting parties might give rise to a relationship
> beyond the parties' contractual dealings. It has been held that, 'in
> the rare circumstance' where a creditor exercises such control over
> the decision-making processes of the debtor as amounts to a
> domination of its will, it may be held accountable for its actions
> under a fiduciary standard. *Matter of Teltronics Services, Inc.*, 29
> B.R. 139, 170 (Bankr. E.D.N.Y. 1983).

*Id.* at 191-92. The Oregon Supreme Court, however, in this same case, affirmed the Oregon

Court of Appeals' decision on much narrower grounds. In *Hampton Tree Farms, Inc. v. Jewett*,

320 Or. 599 (1995), the Oregon Supreme Court held only that a jury could find that a creditor

who agreed to represent a log seller in a business transaction, for the purpose of selling the log

seller's business, acted as the log seller's *agent* and thus owed the log seller fiduciary duties as

part of that traditional principal-agent relationship. The Supreme Court further emphasized that,

in order to find a principal-agent relationship, there must be evidence that both parties consented

to their respective roles. *Id.* at 617; *see also Bennett*, 332 Or. at 160 (rejecting a plaintiff's

argument, premised on *Hampton Tree Farms* and *Georgetown Realty v. Home Ins. Co.*, 313 Or.

97 (1992), that a special relationship exists when "one party's financial interests are dependent

on the other's control"). Accordingly, Plaintiff's reliance on the Oregon Court of Appeals'

decision in *Hampton Tree Farms* is misplaced, and the Court follows the Oregon Supreme

Court's later analysis in *Conway* and *Bennett*.[11]

---

[11] In supplemental briefing, Plaintiff argues that where, as in this case, the parties have no contract, "the applicable rule is the 'control and dominance' rule" articulated by the Oregon Court of Appeals in *Hampton Tree Farms*, and that the Oregon Supreme Court's analysis in *Conway* and *Bennett* does not apply. This distinction is not supported by any Oregon Supreme Court decision. Moreover, the Court finds that, to the extent the "control and dominance" theory was ever recognized by Oregon courts, it is not good law in light of *Conway* and *Bennett*. *See Bennett*, 332 Or. at 161-162 ("[T]he law does not imply a tort duty simply because one party to a business relationship begins to dominate and to control the other party's financial future.").

Further, at oral argument, Plaintiff urged the Court to consider *In re Horton*, 152 B.R. 912 (Bankr. S.D. Tex. 1993), which Plaintiff contends stands for the proposition that grocery cooperatives owe fiduciary duties to their members.[12] *Horton* was a bankruptcy case in which a creditor (a grocery cooperative stock association) sought a nondischargeability determination with regard to debt arising from a Chapter 7 debtor's (the principal of a cooperative member) guaranty and note that the debtor executed personally and on behalf of a cooperative member. The bankruptcy court's only discussion of fiduciary duties was the following paragraph:

> [Creditor] was a cooperative stock association whose members were dependent upon one another for the association's ongoing success. Each member guaranteed its debts to the association, and a personal guaranty was required of all officers, directors, and equity holders. The members were responsible for providing accurate information as to their solvency. Therefore, the members of the association had a fiduciary relationship among themselves and with [Creditor] itself.

*Id.* at 916 (citation omitted). This brief analysis does not support Plaintiff's argument. *Horton* holds only that, under certain circumstances, cooperative members may owe fiduciary duties to each other and to their cooperative association. *Horton* does not hold—and indeed, does not even address—when a cooperative association owes fiduciary duties to its individual members.[13] More importantly, Plaintiff's interpretation of *Horton*—a case interpreting bankruptcy law in the context of a Texas statute—conflicts with the rule articulated by the Oregon Supreme Court's decisions in *Conway* and *Bennett*, which require a legally recognized special relationship

---

[12] *Horton* was not originally briefed by either party, so the Court allowed supplemental briefing on *Horton* after oral argument.

[13] The grocery cooperative stock association at issue in *Horton* also appears to have been structured very differently than Unified. Each cooperative member in *Horton* "guaranteed its debts to the association, and a personal guaranty was required of all officers, directors, and equity holders." *Id.* at 916. Unified had no such requirement with Food 4 Less, and instead dealt only on cash-on-delivery terms with payment made via automatic withdrawal. Even if the former structure could give rise to fiduciary duties under Oregon law, the latter does not.

between the parties to establish extra-contractual fiduciary duties. Accordingly, even if Plaintiff's interpretation of *Horton* were correct, the Court would still follow Oregon Supreme Court precedent on this point.

With the appropriate legal standard clarified, the Court turns to the facts underlying Plaintiff's claim. Plaintiff's breach of fiduciary duty claim is based entirely on facts related to two characteristics of Defendant's business relationship with Food 4 Less: (1) Defendant's status as the supplier of substantially all of Food 4 Less' non-PACA groceries and (2) Defendant's contractual right to obtain payment of its invoices from Food 4 Less' bank account by automatic withdrawal. As to the first characteristic, Plaintiff presents the opinion of Plaintiff's expert witness Patrick A. Davidson, who asserts that, because Unified had supplied the majority of Food 4 Less' non-PACA goods, "the key management powers belonged to Unified." As to the second characteristic, Plaintiff presents the declaration of Michael Leech, the owner of Food 4 Less, who asserts that Unified's "control over both Food 4 Less' inventory and cash, in practical effect, gave Unified control over the key operations of Food 4 Less."

Neither of these characteristics, however, addresses the actual legal question before the Court: whether the parties' relationship "*by its nature*, allows one party to exercise judgment *on the other party's behalf*." *Bennett*, 332 Or. at 161-162 (emphasis added). The declarations of Mr. Davidson and Mr. Leech, on their face, fail to show that the relationship between Defendant and Food 4 Less was such that Defendant agreed to act "for the benefit" of Food 4 Less. Even taken in the light most favorable to Plaintiff, these declarations show, at most, that Defendant engaged in hard bargaining solely for its own benefit. At its core, Plaintiff's fiduciary duty claim reduces to a contention that business agreements entered into at arm's-length solely out of business necessity may, without more, create special relationships with concomitant fiduciary

duties. This position is contrary to Oregon law, which, as discussed above, emphasizes that a putative agent or fiduciary must *agree* to exercise its judgment for the benefit of the putative principal rather than for itself before being subject to the duties of a fiduciary.

Further, Plaintiff's argument that Defendant maintained complete domination and control over Food 4 Less is undermined by the undisputed fact that Defendant's contract with Food 4 Less regarding both automatic debit payments and membership in Unified's grocery wholesale cooperative was revocable at will by either party. It may be the case that Food 4 Less had no economically viable alternative to its contractual arrangement with Defendant. The absence of an economically viable alternative, however, does not create a fiduciary relationship between mere buyers and sellers of goods. Thus, the Court finds as a matter of law that Defendant did not have a fiduciary or special relationship with Food 4 Less, and Defendant is entitled to summary judgment on Plaintiff's claim for breach of fiduciary duty.

## CONCLUSION

Defendant's Motion for Summary Judgment (Dkt. 59) is GRANTED. This case is dismissed.

**IT IS SO ORDERED**.

DATED this 6th day of August, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge